**GREGORY T. MURPHY**
California State Bar No. 245505
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: gregory_murphy@fd.org

Attorneys for Eduardo Martinez-Valdez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE M. JAMES LORENZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 07CR3401-L |
| Plaintiff, | ) | DATE: May 6, 2008 |
| | ) | TIME: 10:00 a.m. |
| v. | ) | |
| EDUARDO MARTINEZ-VALDEZ, | ) | STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION |
| Defendant. | ) | |

**I.**

**SUMMARY OF ARGUMENT**

The Immigration Judge did not consider Mr. Martinez-Valdez for voluntary departure because Mr. Martinez-Valdez did not show he had funds to pay for his return to Mexico. In fact, the law imposes no such requirement. Because the record shows Mr. Martinez-Valdez was both eligible for and had a plausible claim to voluntary departure relief, and because the Immigration Judge's legal error regarding his eligibility excuses his waiver of appeal, this Court should dismiss the indictment against Mr. Martinez-Valdez due to an invalid deportation.

**II.**

**STATEMENT OF FACTS**

**A. History and Background**

On December 27, 2004, the Department of Homeland Security issued Mr. Martinez-Valdez a Notice

to Appear ("NTA") alleging that he was removable from the United States for being an alien present in the United States without having been properly admitted and for being an alien who has been convicted of a crime involving moral turpitude, specifically a violation of California Penal Code § 12031: Carrying a Loaded Firearm. See Exhibit A. The NTA did not allege he had been convicted of an aggravated felony.

On January 19, 2005, Mr. Martinez-Valdez appeared before immigration judge ("IJ") Sean H. Keenan in Eloy, Arizona. See Exhibit B, Transcript of Proceedings. Mr. Martinez-Valdez's immigration proceeding was a group hearing with 11 other pro-se individuals also before the IJ. Id. The immigration judge played a prerecorded notification of rights to the group. The recording ended with a discussion of voluntary departure:

> **If you are eligible for voluntary departure, I will ask you if you have the amount of money to pay your own way back to your own country.** It is alleged the majority are natives and citizens of Mexico. The cost to Mexico from this location by bus as I have been told by government attorneys on past occasions is seven dollars. **I will ask each of you if you have that amount of money.**
>
> **If you do, I will ask the government attorney their position. If the government attorney is not opposed to voluntary departure being granted, I will grant it today and you can return to Mexico today**...If the government is opposed, then it will be your decision if you want your case postponed for a voluntary departure hearing. I cannot do the hearing today, but I will do it as soon as possible.

Exhibit B, p. 4-5.

The Immigration Judge then addressed each respondent in turn. When it was his turn, Mr. Martinez-Valdez admitted that he was not a citizen or national of the United States, and that he had entered the United States without inspection in 1992. Exhibit B, pp 7-8. Counsel for the government moved to strike the allegation that Mr. Martinez-Valdez had been convicted of a crime involving moral turpitude. Id. at 8. The IJ agreed, noting that the alleged conviction "may not be a crime involving moral turpitude." Id. The IJ also struck allegation five, which alleged Mr. Martinez-Valdez's conviction for carrying a loaded firearm. See Exhibit A. Based only on Mr. Martinez-Valdez's admissions, the IJ found he was removable as an alien not lawfully admitted into the United States. Exhibit B, p. 8.

As promised, the Immigration Judge then asked Mr. Martinez-Valdez if he had "the seven dollars for the voluntary departure fee." Exhibit B, p. 9. Mr. Martinez-Valdez responded that he did not. Id. There was no further discussion of voluntary departure.

Mr. Martinez-Valdez explained that although his father, a lawful permanent resident, had petitioned

for him and that his papers were pending, he did not want a continuance to pursue that petition. Id. at 9-10. The immigration judge ordered Mr. Martinez-Valdez removed. See Exhibit C.

**B. Current Proceeding**

According to government reports—the substance of which Mr. Martinez-Valdez neither confirms nor denies—Mr. Martinez-Valdez was found in the United States on April 23, 2007. On December 19, 2007, Mr. Martinez-Valdez was charged by way of indictment with violating 8 U.S.C. § 1326 (Deported alien Found in the United States.). These motions follow.

**III.**

**THIS COURT SHOULD DISMISS THE INDICTMENT DUE TO AN INVALID DEPORTATION**

"In a criminal prosecution under § 1326, the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation." United States v. Zarate-Martinez, 133 F.3d 1194, 1197 (9th Cir. 1998). A defendant such as Mr. Martinez-Valdez, who is charged with illegal reentry under section 1326, has a Fifth Amendment right to attack his removal order collaterally because the removal order serves as a predicate element of his conviction. United States v. Mendoza-Lopez, 481 U.S. 828, 837-38 (1987) ("Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding."). See also United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1047-48 (9th Cir. 2004) (citing Zarate-Martinez and Mendoza-Lopez for these principles).

To successfully collaterally attack his deportation, Mr. Martinez-Valdez must demonstrate that: 1) he exhausted all administrative remedies available to him to appeal his removal order; 2) the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and, 3) the entry of the order was fundamentally unfair. 8 U.S.C. § 1326(d); Ubaldo-Figueroa, 364 F.3d at 1048. "An underlying removal order is 'fundamentally unfair' if: '1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and 2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (citing Zarate-Martinez, 113 F.3d at 1197) (brackets omitted).

Importantly, although Mr. Martinez-Valdez carries the initial burden on the issue of prejudice, once Mr. Martinez-Valdez makes a prima facie showing of prejudice, **the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome**. United

States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003) (emphasis added). As explained below, Mr. Martinez-Valdez can demonstrate each of the elements necessary for this Court to sustain his collateral attack.

**A. Mr. Martinez-Valdez is Exempt from the Exhaustion Requirement**

Mr. Martinez-Valdez's appellate waiver was invalid because the IJ failed to inform Mr. Martinez-Valdez of potential relief from deportation for which he was eligible. A waiver of the right to appeal a removal order does not comport with due process when it is not "considered and intelligent." Id. See also United States v. Pallares-Galan, 359 F.3d 1088, 1096 (9th Cir. 2004); United States v. Leon-Paz, 340 F.3d 1003, 1005 (9th Cir. 2003). As the Ninth Circuit held in Pallares-Galan:

> For a waiver to be valid, the government must establish by "clear and convincing evidence," Gete v. INS, 121 F.3d 1285, 1293 (9th Cir. 1997), **that the waiver is "considered and intelligent."** United States v. Lopez-Vasquez, 1 F.3d 751, 753-54 (9th Cir. 1993)(en banc); see also United States v. Gonzalez-Mendoza, 985 F.2d 1014, 1017 (9th Cir. 1993) (finding a due process violation where immigration judge failed to inquire whether right to appeal was knowingly and voluntarily waived).

Pallares-Galan, 359 F.3d at 1097 (emphasis added.). In this case, the government cannot establish by clear and convincing evidence that Mr. Martinez-Valdez's appellate waiver was "considered and intelligent," because Mr. Martinez-Valdez's waiver was based on inadequate and inaccurate advice regarding his rights.

An IJ's failure to advise the alien of his eligibility for relief from deportation renders the deportation proceeding defective. Ubaldo-Figueroa, 364 F.3d at 1048. See also Arce-Martinez-Valdez, 163 F.3d at 563 ("[W]here the record contains an inference that the petitioner is eligible for relief from deportation, the IJ must advise the alien of this possibility and give him the opportunity to develop the issue."); Lopez-Vasquez, 1 F.3d at 754 (holding that IJ hearing deprived petitioner's right to due process even where the IJ explained the right to appeal and provided petitioner with a form explaining his right to an appeal in Spanish because the information was given to him in a group format); Mendoza-Lopez, 471 U.S. at 840 (failure of IJ to advise alien of his right to appeal and his eligibility for a waiver of deportation violated his due process rights and "amounted to a complete deprivation of judicial review of the determination); Arrieta, 224 F.3d at 1079 (finding due process violation because IJ failed to tell defendant about his eligibility for a waiver of deportation); Moran-Enriquez v. INS, 884 F.2d 420, 423 (9th Cir. 1989) (where record, fairly reviewed by a person intimately familiar with the immigration laws (the IJ) raises a reasonable possibility that the

petitioner may be eligible for relief, the IJ must advise the alien of this possibility, if the petitioner is not advised of this possibility, the appellate waiver is invalid) (citing 8 C.F.R. § 242.17(a)). It therefore is well-settled that Mr. Martinez-Valdez's failure to appeal the IJ's order of deportation and exhaust his administrative remedies cannot bar collateral review of his deportation proceeding where the defects in the proceeding persuaded Mr. Martinez-Valdez that any appeal would be futile.

Here, the IJ concluded-and communicated to Mr. Martinez-Valdez--that Mr. Martinez-Valdez was ineligible for voluntary departure because he could not show he had the seven dollars needed to pay his bus fare to Mexico. See Exhibit B, pp 5, 9. This was error. Although the respondent must establish the financial ability to depart in order to qualify for post-conclusion voluntary departure, "**under section 240B(a)**, [addressing pre-conclusion voluntary departure] **an alien need not show that he has good moral character or that he has the financial means to depart the United States**." In re Eloy Arguelles-Campos, 22 I. & N. Dec. 811, 817 (BIA, June 07, 1999)(emphasis added). See also 8 C.F.R. § 1240.26 (setting forth requirements for pre-conclusion voluntary departure.).[1] In this case, the IJ simply made a mistake, apparently applying the requirements for post-conclusion voluntary departure in the pre-conclusion context. As a result, the IJ did not consider Mr. Martinez-Valdez for voluntary departure or permit him to request it. Because Mr. Martinez-Valdez in fact was eligible for voluntary departure--a fact the IJ accepted provided could pay the return trip fee[2]--this mistake of law renders his waiver invalid, and excuses his failure to exhaust his remedies.

---

[1]Mr. Martinez-Valdez does not argue that the government was required to pay for his voluntary return to Mexico, only that he was not required to establish the ability to pay for his return as a prerequisite for consideration for voluntary departure. Compare 8 U.S.C. § 1229(b)(1)(D) (to qualify for post-conclusion voluntary departure, the alien must establish by clear and convicting evidence that the alien has the means to depart and intends to do so) with 8 U.S.C.§1229(a)(1)(pre-conclusion voluntary departure contains no such requirement). For pre-conclusion voluntary departure, the ability to pay is simply an irrelevant consideration. Instead, the Immigration Judge sets a time period--not to exceed 120 days-- in which the alien must depart the depart at his own expense. See 8 U.S.C. §1229c(a)(2). The IJ may also set a bond. See 8 U.S.C. §1229(a)(1)(C)(3). If the alien does not post bond and/or depart within the designated period, the grant of voluntary departure transforms into a removal order subject to the attendant bars on re-admission and a fine. See 8 C.F.R. §1240.26(d) (Upon granting voluntary departure "the immigration judge shall also enter an alternate order of removal"); 8 U.S.C. § 1229c(d) (listing penalties for failing to depart.).

[2]See Exhibit B, p.4 ("If you are eligible for voluntary departure, I will ask you if you have the amount of money to pay your own way back to your own country.")

**B. Mr. Martinez-Valdez Was Deprived of Judicial Review**

To sustain a collateral attack on his removal order, Mr. Martinez-Valdez must also demonstrate that the deportation proceedings improperly deprived him of judicial review. 8 U.S.C. § 1326(d)(2). As explained above, Mr. Martinez-Valdez was deprived of the opportunity for judicial review because the IJ erroneously concluded he did not meet the threshold requirements for voluntary departure. Compare Ubaldo-Figueroa, 364 F.3d at 1049-50 (holding that the failure to inform an immigrant of possible eligibility for relief from removal is a denial of due process that invalidates the underlying deportation proceeding).

**C. Mr. Martinez-Valdez's Deportation Proceeding Was Fundamentally Unfair and Prejudicial**

Finally, Mr. Martinez-Valdez must show that the proceedings were fundamentally unfair. "An underlying removal order is 'fundamentally unfair' if: (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (quoting Zarate-Martinez, 133 F.3d at 1197). To establish prejudice, Mr. Martinez-Valdez does not have to show that he would have been granted relief. Instead, he need only show that he had a "'plausible' ground for relief from deportation." Id. at 1050 (citing Arrieta, 224 F.3d at 1079). Furthermore, as noted previously, although Mr. Martinez-Valdez carries the initial burden on the issue of prejudice, once Mr. Martinez-Valdez makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome. Gonzalez-Valerio, 342 F.3d at 1054.

**1. Mr. Martinez-Valdez Suffered Prejudice As a Result of the IJ's Misadvisal Regarding Voluntary Departure**

Mr. Martinez-Valdez satisfies § 1326(d)'s prejudice requirement because he was, in fact, eligible for pre-conclusion voluntary departure and had a plausible claim for relief. When IIRIRA took effect in 1997, it added § 1229c(a) to make voluntary departure much easier to obtain prior to the conclusion of the immigration hearing. In particular, section 1229c(a), unlike the pre-IIRIRA version of voluntary departure, former 8 U.S.C. § 1254(e), does not require the alien to "establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years." See 8 U.S.C. § 1254(e) (1995). Instead, IIRIRA's enactment of § 1229c(a) in 1996 created a new form of voluntary departure whose primary focus was minimizing administrative burdens associated with lawful physical expulsion of illegal aliens—by requiring waiver of the right to a complete hearing, eliminating the availability of judicial review

and stays of the time period for departure—rather than rewarding the deserving with a means of avoiding formal deportation. Compare 8 U.S.C. § 1229c(a) (relief available "in lieu of being subject to proceedings under section 1229a of this title or prior to the completion of such proceedings") with § 1254 (1995) (repealed by Pub. L. 104-208 (Sept. 30, 1996)) (requiring a showing of good moral character but not waiver of proceedings).

Within the current immigration scheme, pre-conclusion voluntary departure "reveals Congress' intention to offer an alien a specific benefit—exemption from the ordinary bars on subsequent lawful admission—in return for a quick departure." Banda-Ortiz v. Gonzales, 445 F.3d 387, 390 (5th Cir. 2006). In effecting this contract-like exchange, the IJ may exercise discretion to grant voluntary departure even in the face of multiple immigration violations and fraud. E.g. Matter of Polanco-Davila, 2006 WL 901504 (BIA 2006) (unpublished).

Mr. Martinez-Valdez therefore is precisely the person for whom pre-conclusion voluntary departure was designed. As the unmarried child of a lawful resident (and more immediately when his father has naturalized), Mr. Martinez-Valdez is eligible for a visa permitting lawful entry, and therefore has an interest in avoiding the 10 year bar on lawful admission to the United States that would attend an order of deportation. Both parties therefore have legitimate interests in the speedy resolution of his immigration case before the Immigration Judge: Mr. Martinez-Valdez obtains prompt release from immigration detention by exchanging the right to seek admission before the IJ for the right to seek admission through the consulate abroad without the normal time bars on readmission. The government conserves resources. And all parties and the IJ give meaning to the stated purpose of the Immigration and Naturalization Act: the preservation of family unity. See Watkins v. I.N.S. 63 F.3d 844, 851 (9th Cir. 1995) ("The favored status given to the family is firmly entrenched in immigration law: 'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united.'") (citing H.R.Rep. No. 1199 , 85th Cong., 1st Sess. 7, reprinted in 1957 U.S.Code, Cong. & Admin.News 2016, 2020.").[3]

---

[3]Furthermore, as noted above, Mr. Martinez-Valdez's alleged convictions do not bar this relief. As noted above, pre-conclusion voluntary departure contains no requirement that the applicant demonstrate good moral character. Indeed, by specifically omitting a "good moral character" requirement from pre-conclusion voluntary departure, Congress indicated that it

Interestingly, this particular Immigration Judge indicated a willingness to grant voluntary departure unquestioningly if government counsel did not oppose.[4] Because this was Mr. Martinez-Valdez's first and only deportation, because he was a young man who had lived in the United States for the last twelve of his twenty-one years, because his father was working give him a lawful right to be in the country, and because an application for admission in immigration court would result in time-consuming litigation, it is at least plausible that government counsel--who earlier had withdrawn the allegation that Mr. Martinez-Valdez had been convicted of a crime involving moral turpitude--would not have opposed his application for voluntary departure. Even if she had opposed, it is at least plausible under the circumstances that an immigration judge would have granted the relief. Compare Matter of Polanco-Davila, 2006 WL 901504 (BIA 2006) (unpublished) (IJ grant of voluntary departure affirmed, despite fraudulent testimony before same IJ, because IJ properly weighed these negative factors with any equities, including the respondent's United States citizen wife and three children and pending petition for an immigrant visa.).

**2. Mr. Martinez-Valdez's Alleged Conviction Does not Bar Voluntary Departure.**

Government counsel believes Mr. Martinez-Valdez has been convicted of an "aggravated felony" because his alleged conviction for possession of a loaded firearm, when enhanced by his status as a felon, is "an offense described in 18 U.S.C. § 922(g)." See 8 U.S.C. § 1101(a)(43)(E)(ii) (describing the federal offense of felon in possession of a firearm). The government therefore may argue that Mr. Martinez-Valdez was not eligible for voluntary departure and cannot establish he was prejudiced by the IJ's error. This anticipated argument must be rejected for two reasons. First, Mr. Martinez-Valdez has not been convicted of an aggravated felony. Second, even if he had, it would not bar him from receiving voluntary departure.

**A. Mr. Martinez-Valdez has not been convicted of an aggravated felony**

No federal or immigration court has ever held a violation of California Penal Code § 12031 to be an aggravated felony. The Service did not seek to remove Mr. Martinez-Valdez on the grounds that he had been

---

preferred any potential moral character bar be dealt with via a waiver filed with the future application for admission.

[4]Mr. Martinez-Valdez offers this description of his proceedings to show that voluntary departure was "plausible." Of course, the issue now is not how this particular IJ would have decided the case had he applied the correct standard. Rather, the question before this Court is whether any immigration judge could have granted Mr. Martinez-Valdez voluntary departure. See Ubaldo-Figueroa, 364 F.3d at 1042.

convicted of an aggravated felony. See Exhibit A. The immigration judge in Mr. Martinez-Valdez's case did not consider it to be an aggravated felony. See Exhibit B, pp 4, 8, 9. The Immigrant Legal Resource center, which publishes for public defenders a list of California offenses that--taking a conservative approach--might be considered aggravated felonies, does not consider a violation of § 12031 an aggravated felony. See Quick Reference Chart for Determining Selected Immigration Consequences of Selected California Offenses, accessed at http://www.ilrc.org/Cal_DIP_Chart_by_section.pdf on April 21, 2008. Indeed, the prosecutor likely will acknowledge he is entirely alone in believing a violation of § 12031 is an aggravated felony.

The reason for the unanimity of opinion to the contrary is simple: the defendant's felon status is a sentencing enhancement for, rather than an element of, California Penal Code § 12031. Under Taylor v. United States, 495 U.S. 575, 602 (1990), to determine whether a conviction qualifies as an aggravated felony, federal courts "look to the fact of conviction and the statutory definition of the prior offense," then compare the elements of the prior to the federal definition at issue. The Ninth Circuit has held, en banc, that the "prior offense" described in Taylor means the statute of conviction without reference to any sentencing enhancements. United States v. Corona-Sanchez, 291 F.3d at 1203, 1208-1209 (9th Cir.2002) (en banc). Because PC § 12031 has no element of felon status, it cannot be matched with the federal crime of felon in possession, 18 U.S.C. § 922(g).

In this regard, a comparison with California's actual felon in possession statute is instructive. California Penal Code § 12021 provides that "(a)(1) Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country..., and who owns, purchases, receives, or has in his or her possession or under his or her custody or control any firearm is guilty of a felony." The elements of § 12021 therefore are: 1) the defendant possessed a firearm; 2) the defendant knew that he possessed the firearm; and 3) the defendant had previously been convicted of a felony. See Judicial Council Of California Criminal Jury Instruction ("CALCRIM") 2510. By contrast, the offense of Carrying a Loaded Firearm, PC § 12031 does not require the defendant was convicted of a felony. Rather, the elements of §12031 are: 1) the defendant carried a loaded firearm; 2) the defendant knew that he was carrying a firearm; and 3) at that time, the defendant was in a public place or on a public street. See CALCRIM 2530. Only if the defendant is found guilty of the substantive offense may the trial court instruct the jury to determine whether the defendant had previously had been convicted of a felony. Jury instructions

for that analysis are found at CALCRIM 2540, entitled "Sentencing Factors."[5]

The government may argue that even though Mr. Martinez-Valdez's alleged conviction for PC § 12031 is not an aggravated felony, this Court nonetheless can find that he was convicted of an aggravated felony because Mr. Martinez-Valdez admitted the essential elements of an aggravated felony during his plea colloquy. This argument, if the government chooses to make it, would turn Taylor on its head. As noted above, under the categorical analysis, this Court compares the statute of conviction, rather than the defendant's actual conduct, to the equivalent federal offense. See Taylor, 495 U.S. at 600. Thus, when the statute of conviction statue omits an element entirely, it can **never** be a qualifying offense. See Navarro-Lopez v. Gonzales, 503 F.3d 106, 1073 (9th Cir. 2007)(en banc)("The modified categorical approach...only applies when the particular elements in the crime of conviction are broader than the generic crime. When the crime of conviction is missing an element of the generic crime altogether, we can never find that a jury was actually required to find all the elements of the generic crime.)(internal citations). Put another way, when a state statute entirely omits an element of the federal offense entirely, the state statute is "categorically" overbroad. That is the situation here. PC § 12031, unlike § 12021, contains no element of felon status. Pursuant to Navarro-Lopez, therefore, any admissions by Mr. Martinez-Valdez during his plea colloquy are simply irrelevant.

In sum, binding precedent forecloses even the most imaginative effort to transform Mr. Martinez-Valdez's conviction into an aggravated felony. Because he was eligible for voluntary departure, and because the IJ's error of law precluded him from consideration for this plausible relief, Mr. Martinez-Valdez's flawed removal proceeding cannot serve as the predicate for this criminal prosecution. The Court should order the indictment against Mr. Martinez-Valdez dismissed.

**B. Because Mr. Martinez-Valdez was never "admitted," he would be eligible for voluntary departure even if he had been convicted of an aggravated felony**

As noted above, it is well established and uncontroversial that Mr. Martinez-Valdez's conviction for PC § 12031 does not qualify as an aggravated felony. However, even if it did, Mr. Martinez-Valdez still would have been eligible for voluntary departure but for the IJ's mistake of law.

It was undisputed that Mr. Martinez-Valdez entered without inspection, and that he was never

[5]Copies of these jury instructions are attached as Exhibit D.

lawfully admitted to the United States or granted an adjustment of status to lawful permanent resident. See Exhibit A. As an unlawful entrant who had never been inspected and authorized to enter the United States, Mr. Martinez-Valdez did not fall under § 1229c(a)'s provision disqualifying "[a]ny alien who is convicted of an aggravated felony at any time after admission." See 8 U.S.C. § 1227(a)(2)(A)(iii). Mr. Martinez-Valdez was therefore eligible for voluntary departure. As noted above, by failing to advise Mr. Martinez-Valdez of his eligibility, as required by the Pallares-Galan and Muro-Inclan line of cases, the IJ deprived him of any opportunity for judicial review.

This Court need look no further than the plain language of 8 U.S.C. § 1229c(a) to determine whether Congress intended an aggravated felon who was not convicted after being lawfully admitted to remain eligible for pre-conclusion voluntary departure—it did. Thus, although there exists a regulation advancing a different standard, 8 C.F.R. § 1240.26, the regulation is invalid and the agency interpretation is entitled to no Chevron deference.

Complicating this relatively straightforward undertaking, however, is 8 U.S.C. § 1229c(e), which purports to convey to the AG unfettered authority to further restrict eligibility for voluntary departure. Admittedly, this legislative delegation, if valid, provides a separate and independent ground that lends 8 C.F.R. § 1240.26 legitimacy. It is not valid, however, because § 1229c(e) is an unconstitutional delegation of legislative power that violates separation of powers. Because the regulation is neither a permissible interpretation of the controlling statute nor an exercise of validly conveyed authority, the plain text of § 1229c(a) controls.

**i. The Plain Language of the Statute Controls**

This Court's interpretive task begins with the plain language of the statute. See Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1168 (9th Cir. 2006). No deference is due to "an agency's construction of the statute which it administers . . . [if] Congress has spoken directly to the precise question at issue [and] the intent of Congress is clear." Natural Resources Defense Council v. EPA, 915 F.2d 1314, 1320 (9th Cir. 1990) (quoting Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)). When "Congress has spoken directly, in unambiguous terms," the Court need look no further—"that is the end of the matter." Id. Legislative prerogative requires the judicial inquiry to end with clearly stated plain language because "the court, as well as the agency, must give effect to the unambiguously expressed

intent of Congress." Id.

When analyzing the text of § 1229c(a), this Court is "obliged to give effect, if possible, to every word Congress used." Clark, 460 F.3d at 1175. This Court has "consistently rejected interpretations that would render a statutory provision surplusage or a nullity." Id. (quoting In re Cervantes, 219 F.3d 955, 961 (9th Cir. 2000); alterations omitted). Reading the words "at any time after admission" out of the provision incorporated by § 1229c(a) would violate the rule that the statutory text be construed in "the broader part of the statute as a whole" in order to "avoid a construction which renders any language of the enactment superfluous." See id. at 1175, 1176 (citations omitted). "Only where a sensible result isn't reachable may [this Court] resort to the drastic step of ignoring statutory language." Id. (quoting Hearn v. W. Conference of Teamsters Pension Tr. Fund, 68 F.3d 301, 304 (9th Cir. 1995)(alterations omitted)).

The Ninth Circuit Court of Appeals has embraced Mr. Martinez-Valdez's reading. See Ortiz-Lopez, 385 F.3d at 1205 n.3 ("Relief from removal under § 1229c(a) is categorically barred to . . . those 'deportable under section 1227(a)(2)(A)(iii),' which in turn means those convicted of an aggravated felony at any time after admission."). Perhaps more compelling, the Attorney General, in promulgating 8 C.F.R. § 1240.26, has also acknowledged that the § 1229c(a) plainly states what Mr. Martinez-Valdez now argues. See Interim Rules Implementing IIRIRA, 62 Fed. Reg. 10312, 10326, Att'y Gen. Order No. 2017-97 (March 6, 1997) ("Sections 240B(a)(1) and 240B(b)(1)(C) of the statute bar aliens deportable under section 237(a)(2)(A)(iii) of the Act from voluntary departure. Because aliens entering without inspection are no longer considered deportable, however, the statutory bar might be read as allowing such aliens to obtain voluntary departure despite an aggravated felony conviction."). These comments make clear that the AG was aware of the conflict between the regulation he issued and the statutory text; the AG viewed the regulation as correcting a perceived "anomaly" created by the plain language, see id. ("The Department does not believe that Congress intended [the anomaly of more favorable treatment for aggravated felons who enter without inspection]."). The AG believed that issuing the regulation changed the state of the law. Id. ("the Department now exercises its discretion to bar such aliens from receiving this form of relief").

**ii. No Exception to the Plain Language Rule Applies**

The regulation cannot, however, trump the statutory text as a matter of interpretation unless "applying the plain language of the statute would lead to patently absurd results," United States v. Brown, 333

U.S. 18, 27 (1948), or "would render another section within the statute or within the act inoperative or contradictory," Yates v. Hendon, 541 U.S. 1, 17-18 (2004). Because neither exception applies, the "strong presumption that Congress has expressed its intent in the language it chose" is dispositive. See INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987); cf. Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc., 448 F.3d 1092, 1096 (9th Cir. 2006) (Bybee, J., dissenting from denial of rehearing en banc) ("I know of no 'illogicality' doctrine that permits us [or the AG] to change the words in a statute when we think there is a more logical way that Congress could have written it.").

Section 1229c(a)'s explicit limiting language, which makes pre-conclusion voluntary departure relief unavailable for someone who entered lawfully and then committed an aggravated felony but permits an unlawful entrant convicted of such a crime to apply for such relief makes sense. Different treatment of lawful and unlawful entrants reflects several perfectly rational policy choices: (1) lawful entrants who committed a serious crime after they were granted the privileges and benefits of lawful admission have engaged in an abuse of trust that unlawfully present felons have not;[6] (2) such persons "pose[] a potentially higher risk of recidivism," Taniguchi v. Schultz, 303 F.3d 950, 958 (9th Cir. 2002), and should not get the "second chance" to lawfully reenter that voluntary departure could offer, see Lara-Ruiz v. INS, 241 F.3d 934, 948 (7th Cir. 2001); (3) for unlawfully present criminal aliens, it is a higher priority to ensure their physical departure from the U.S. as expeditiously as possible, with minimal resistance and minimal expenditure of the administrative resources necessary to complete a full-fledged removal hearing; (4) the "benefit" of voluntary departure is virtually illusory for unlawful entrants because they are less likely to have the familial ties to seek lawful reentry, and therefore this form of relief achieves the same result as formal removal while saving the expense of subsidizing the alien's return travel;[7] and (5) Congress need only address a given problem "one

---

[6]The "abuse of trust" rationale has been embraced by at least seven circuits to explain analogous ineligibility of criminal legal permanent residents (LPRs) versus criminal non-LPRs, who are eligible for INA § 212(h) relief. See Cordes v. Gonzales, 421 F.3d 889, 897 (9th Cir. 2005); Latu v. Ashcroft, 375 F.3d 1012, 1020-21 (10th Cir. 2004); De Leon Reynoso v. Ashcroft, 293 F.3d 633, 640 (3d Cir. 2002); Jankowski-Burczyk v. INS, 291 F.3d 172, 176 (2d Cir. 2002); (Lukowski v. INS, 279 F.3d 644, 647-48 (8th Cir. 2002); Moore v. Ashcroft, 251 F.3d 919, 925-26 (11th Cir. 2001); Lara-Ruiz v. INS, 241 F.3d 934, 947-48 (7th Cir. 2001).

[7]Cf. De Leon Reynoso, 293 F.3d at 640 (eligibility for lawful return of unlawful entrants, because they likely lack "the ties to obtain a relative to petition the Attorney General for adjustment of status," is "more theoretical than real . . . and could have led Congress to omit non-

step at a time."[8] Thus, Congress's chosen language is clear.

Neither is the plain language of § 1229c(a) a "typographical error," which might justify a regulatory correction of Congress's inadvertent mistake. To the contrary, the plain meaning, advocated by Mr. Martinez-Valdez, is "fully grammatical and can be understood by people of ordinary intelligence." Amalgamated Transit Union, 448 F.3d at 1098 (dissent). Had it so desired, Congress could quite easily have substituted the language it used, "is not deportable under section 1227(a)(2)(A)(iii)," with the regulatory language, "has not been convicted of a crime described in section 101(a)(43) of the Act" or with even simpler language, such as "has not been convicted of an aggravated felony." It did not.[9] The plain language controls.

**iii. Section 1229c(e) Does Not Authorize the Narrowing Regulation**

The only remaining source of authority for 8 C.F.R.§ 1240.26 is 8 U.S.C. § 1229c(e), which provides: "The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens." 8 U.S.C. § 1229c(e) ("Additional conditions"). To the extent that this grant of authority supports the AG's promulgation of § 1240.26(b)(1)(i)(E) (enlarging § 1229c(a)'s class of ineligible aliens to include all individuals convicted at any time of an aggravated felony), it transgresses the constitutional principles of separation of powers and limit on legislative delegation.

Section 1229c(e) purports to convey to the AG the quintessentially legislative power to repeal duly-enacted legislation, in violation of the Constitution's dedication of such authority to Congress. See U.S. Const. Art. I, § 7 (laws may be made only upon bicameral passage and presentment to the President); Clinton v. New York, 524 U.S. 417, 438 (1998) (absence of a Constitutional provision "that authorizes the President [or the Attorney General] to enact, to amend, or to repeal statutes" is "equivalent to an express prohibition").

---

LPRs in [§ 1229c's disqualification provision]").

[8]Jankowski, 291 F.3d at 179. Moreover, "Congress may well have considered that it had already suitably solved the problem presented by [unlawful entrant] aggravated felons" through § 1228's expedited removal provisions, which foreclose all relief so long as the AG elects to use this mechanism. Jankowski, 291 F.3d at 179.

[9]Congress's word choice was not due to confusion about the difference between deportability and inadmissibility, as the AG suggests, 62 Fed. Reg. at 10326. Congress was well aware of this difference, evident from its ability to distinguish between these concepts in the very same section of IIRIRA. See, e.g., Pub. L. 104-208, § 304 (defining removable as inadmissible under § 212 or deportable under § 237).

Section 1229c(e)'s delegation of power suffers from the same problems as the Line Item Veto Act (LIVA), struck down by the Supreme Court in Clinton. The President's power to unilaterally veto provisions of duly-passed budgetary legislation under LIVA amounted to the power of unilateral repeal—a power the President may not constitutionally posses. Id. at 445-46 ("The fact that Congress intended such a result if of no moment."). Like LIVA, § 1229c(e) unconstitutionally authorizes an executive branch officer, the AG, to repeal or partially repeal § 1229c(a)'s provision creating the possibility of pre-conclusion voluntary departure. Under its terms, the AG could "limit eligibility for voluntary departure" by making it entirely unavailable—effectively repealing that part of the statute. See id. at 441 ("cancellation of one section of a statute may be the functional equivalent of a partial repeal even if a portion of the section is not canceled"). It makes no difference that Section 1240.26 exercises § 1229c(e)'s power to effect a partial (and not a full) repeal of § 1229c(a)—by eliminating voluntary departure for the group of otherwise eligible unlawful entrants to which Mr. Martinez-Valdez belongs, but not for everyone. See Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 473 (2001) (an agency cannot "cure an unconstitutionally standardless delegation of power by declining to exercise some of that power"). Neither does the AG's discretion to deny voluntary departure on an individual basis ameliorate the problem because the regulation results in a crucial functional difference: it abrogates the right to individual consideration for relief. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266-68 (1954) (the BIA's "*failure to exercise* its own discretion, contrary to existing valid regulations," due to the AG's blacklisting of petitioner, violated petitioner's due process right to the "opportunity to try . . . to convince the Board" to exercise discretion in his favor); accord Clinton, 524 U.S. at 446-47, 466-67 (Scalia, J., dissenting) (advancing such an argument, rejected by the Court).

Section 1229c(e)'s standardless grant of authority to restrict voluntary departure eligibility also runs afoul of the nondelegation principle because it fails to "lay down . . . an intelligible principle to which the person or body authorized to act is directed to conform." Whitman, 531 U.S. at 472 (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)). Indeed, the statute provides "literally no guidance of the exercise of discretion." Id. at 474. Under its terms, the AG may "limit eligibility . . . for *any* class or classes of aliens." 8 U.S.C. § 1229c(e) (emphasis added). This unfettered grant of authority stands in stark

contrast to legitimate delegations, where Congress has typically identified a specific purpose,[10] "declared a general rule and imposed the duty of ascertaining what particular cases came within the rule," see Panama Refining Co. v. Ryan, 293 U.S. 388, 426 (1935), or charged the agency with a micro-level administrative task, see Whitman, 531 U.S. at 475 (agency to define which types of grain elevators are "country elevators"). Because "Congress has set up [no] standard for the [AG's] action," has not "required any finding by the [AG] in the exercise of the authority" under the provision, and has made no clear declaration of policy, § 1229c(e)'s broad grant of authority is at the least constitutionally infirm, if not entirely unconstitutional. See Panama Refining Co., 293 U.S. at 415.

Particularly telling is the fact that the AG has employed § 1229c(e)'s power to contravene the express language used by Congress, see 62 Fed. Reg. at 10326, a decision made on the same policy level as the legislative act—which smacks of an "undemocratic" legislative attempt to "escap[e] the sort of accountability that is crucial to the intelligible functioning of a democratic republic."[11] John Hart Ely, Democracy and Distrust 132 (1980) (legislators may delegate power to avoid "politically controversial decisions—to leave them instead to others, most often others who are not elected or effectively controlled by those who are"); see also Cass R. Sunstein, Nondelegation Canons, 77 U. Chi. L.Rev. 315, 317-18 (2000) ("certain highly sensitive decisions should be made by Congress, and not by the executive pursuant to open-ended legislative instructions").

---

[10]See United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001725, 416 F.3d 977, 979-80 (9th Cir. 2005) (agency to define what sort of shotgun "is generally recognized as particularly suitable for sporting purposes"); see also South Dakota v. United States Department of the Interior, 423 F.3d 790, 798-99 (8th Cir. 2006) (statute authorizing the Secretary of the Interior to acquire property "for the purpose of providing land for Indians").

[11]This risk appears doubly likely in light of § 1229c(e)'s jurisdiction-stripping provision: "No court may review any regulation issued under this subsection." This sentence does not bear upon the appeal at hand, where appellate jurisdiction is undisputed in this direct federal criminal appeal. Moreover, 8 U.S.C. § 1252(a)(2)(D), permitting judicial review of "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals," appears to permit direct review of the argument raised by Mr. Martinez-Valdez, notwithstanding "any other provision of this chapter . . . which limits or eliminates judicial review." Finally, precluding consideration of the regulation here would raise serious constitutional problems. Accord United States v. Klein, 80 U.S. (13 Wall.) 128, 146 (1871) (Congress lacks authority to enact statutes purporting to deny jurisdiction, but which effectively "prescribe a rule for the decision of a cause in a particular way").

In light of its likely, if not actual, unconstitutionality, constitutional avoidance at the very least requires the scope of § 1229c(e) to be limited to authorize only legitimate administrative purposes. One possible construction would limit "any class or classes of aliens" to classes defined by some nexus to reducing the administrative burden, which is in line with § 1229c(a)'s goal of permitting physical removal without the expending the time and resources necessary to conduct a full hearing. Other provisions of 8 C.F.R. § 1240.26 advance such a goal: subsection (A) requires a request to happen at the earliest merits hearing; (B) permits relief only once; (C) requires the alien not to contest removability; and (D) ensures that no appeal will be taken. Subsection (E), by contrast, would be unauthorized by such a construction because it lacks such a nexus and would actually *increase* the administrative burden by requiring an IJ to conduct a full hearing for individuals like Mr. Martinez-Valdez and bear the additional burden of potential appeal.

## IV.

## CONCLUSION

The Immigration Judge erred when he concluded Mr. Martinez-Valdez did not qualify for voluntary departure. This error deprived Mr. Martinez-Valdez of his due process right to a fair removal proceeding. The indictment against him should be dismissed.

Respectfully submitted,

DATED: April 22, 2008

/s/ Gregory T. Murphy

**GREGORY T. MURPHY**
Federal Defenders of San Diego, Inc.
Attorneys for Eduardo Martinez-Valdez